# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN  DIVISION

THE ESTATE OF ALFONSO C. ASKEW,
By the Special Administrator Nicholas D.
Laudato
           Plaintiff,

    v.

TRUMBULL COUNTY, *et al.,*

         Defendants.

CASE NO.  4:21-CV-02133

JUDGE DAVID A. RUIZ

---

## MEDICAL DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Now come Defendants, Malvasi, LLC, Dr. Phillip Malvasi, Carla Ahart, Tayler Simmons, Jennifer Bach, Jess Johnson, and Bree Brezinski (aka Bree Bright) (collectively "the Medical Defendants") who, pursuant to Fed. Civ. R. Proc. 56(c), hereby move the Court for summary judgment on Complaint Count One.   Additionally, Defendants Carla Ahart and Jennifer Bach move for summary judgment on all Counts of the Complaint.  A Memorandum in Support is attached hereto and incorporated herein by reference.

Respectfully submitted,

*/s/ John D. Latchney*
John D. Latchney (0046539)
W. Bradford Longbrake (0065576)
Hanna, Campbell & Powell, LLP
3737 Embassy Parkway, Suite 100
Akron, OH  44333
T: (330) 670-7602; F: (330) 670-7458
Email: jlatchney@hcplaw.net; and
      blongbrake@hcplaw.net

*Counsel for Defendants Phillip Malvasi, D.O.,
LLC, Phillip Malvasi, D.O., Taylor Simmons,
Bree Bright, Jess Johnson, Carla Ahart and
Jennifer  Bach*

0

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES                                                                   2

I.      INTRODUCTION                                                                   3

II.     STATEMENT OF FACTS                                                             3

III.    LAW AND ARGUMENT                                                              9

        The Medical Defendants are entitled to judgment as a matter of law on
        Complaint Count I—the Section 1983 deliberate indifference claim.              9

        A.      The applicable legal standard:  *Farmer v. Brennan*, 511 U.S. 825 (1994).   9

        B.      None of the Defendants "subjectively perceived facts from which
                to infer substantial risk to the [detainee], that he [or she] did in fact
                draw the inference, and that he [or she] then disregarded that risk."      12

        Two of the Individual Defendants, LPN Ahart and MA Bach, are
        entitled to summary judgment on Plaintiff's entire Complaint.

IV.     CONCLUSION

## **TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)

*Bell v. Wolfish*, 441 U.S. 520, 535(1979)

*Berrier v. Lake County, Ohio*, No. 1:22 CV 813, 2024 WL 4591816, at *8
    (N.D.Ohio Oct. 28, 2024)

*Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 594 (6th Cir. 2021)

*Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013)

*Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)

*Est. of Majors v. Gerlach*, 821 F. App'x 533, 547 (6th Cir. 2020)

*Farmer v. Brennan*, 511 U.S. 825 (1994)

*Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991)

*Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 567 (6th Cir. 2020)

*Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 873 (6th Cir. 1982)

*Lawler as next friend of Lawler v. Hardeman Cnty., Tennessee*,
    93 F.4th 919, 926 (6th Cir. 2024)

*Little v. City of Morristown, Tennessee*, No. 23-5302,
    2024 WL 1530468, at *2 (6th Cir. Apr. 9, 2024)

*Magby v. Fender*, No. 1:22 CV 00019-DAR,
    2022 WL 1521909, at *5 (N.D.Ohio May 13, 2022)

*Mason v. Eddy*, No. 1:18 CV 2968, 2019 WL 3766804, at *13
    (N.D.Ohio Aug. 9, 2019)

*Mitchell v. Hininger*, 553 F.App'x 602, 604 (6th Cir. 2014)

*Parsons v. Caruso*, 491 F. App'x 597, 602 (6th Cir. 2012)

*Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018)

*Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)

## MEMORANDUM IN SUPPORT

### I.   INTRODUCTION

Relative to all of the Medical Defendants, this Motion is limited to Complaint Count I—the Section 1983 claim—which alleges deliberate indifference to the serious medical needs of pretrial detainee Askew.  Applying the legal standard in *Farmer v. Brennan*, 511 U.S. 825 (1994) which, in accordance with *Little v. City of Morristown, Tennessee*, No. 23-5302, 2024 WL 1530468, at *2 (6th Cir. Apr. 9, 2024), is applicable to claims arising before September 2021, the Medical Defendants are entitled to judgment as a matter of law because Plaintiff cannot establish that each of the Defendants  subjectively perceived facts from which to infer substantial risk to the detainee, that he or she did in fact draw the inference, and that he or she then disregarded that risk.

Regarding Defendants Carla Ahart, LPN, and Jess Johnson, Medical Assistant, they move for summary judgment on all claims against them. There's no affirmative evidence in the record that LPN Ahart had any involvement in or made any decisions regarding the care and treatment of decedent Askew.  Regarding MA Johnson, she wasn't presented with any facts or information which would trigger a need to do anything other than what she did in this case.

### II.  STATEMENT OF FACTS

On November 6, 2020, Alfonso Askew was booked into the Trumbull County Jail for a probation violation. **Doc. 90, PageID#5085**.  During booking, the only pre-screen question that Mr. Askew responded to positively was that he was taking medication; all other responses for pre-screen, suicide risk, and visual observations were negative. *Id.*

Dr. Phillip Malvasi is contracted as the medical provider at the Trumbull County Jail. **Doc. 88, PageID#3659**.  In November 2020, the medical assistants (hereafter "MA" or "MAs") who provided services at the Trumbull County Jail were Bree Bright (nka Brzezenski), Jessica

3

Johnson, Jennifer Bach, Tayler Simmons.  Additionally, LPN Carla Ahart was also employed in a supervisory role.  All were employed Defendant Malvasi, LLC.  *Id*., **PageID#3675**, Malvasi depo. at 50, l. 9-17.

On November 9, 2020, Dr. Malvasi was at the Jail to see inmates from 5:55 to 6:40 a.m. **Doc 88, PageID#3727**,  Malvasi depo. at 102, l. 20-24.  Dr. Malvasi did not see Mr. Askew because there were no complaints presented to him at that time and he was not on the "sick call" list.

Later that day, in the afternoon of November 9, 2020, based upon his complaints, Mr. Askew was given a urinalysis test at approximately 4:34 p.m. **Doc 68**, **PageID#496,** Bach Depo. at 116-117, Ex. B.  MA Bach was on duty from 3:00 p.m. on November 9, 2020 until 7:00 a.m. on November 10. 2020.  **Doc 68, Pltf's Ex. 21, PageID#715.**

MA Bach doesn't believe that she ever saw Mr. Askew.  **Doc. 68, PageID#569**, Bach depo. at 108, l. 6-16. Bach believes she completed some documentation regarding Askew, but the services performed did not necessitate Bach see Askew.  *Id*. at l. 17-20.

Bach explained that Askew, via the electronic kiosk, complained about real bad pain and having a gallstone.[1]  *Id*., **PageID#571**, Bach depo. at 110, l. 1-3.  But prior to that complaint, Askew had already been brought to the medical department for an urinalysis test, which does not require the inmate to see the MA.  *Id*., l. 10-19; **PageID#573**, Bach depo. at 112, l. 4-7, 18-21.

---

[1]        Dr. Malvasi explained that the only way Askew could know that he had a gallstone issue is if he had previously been tested.  **Doc 88, PageID#3805**, Malvasi depo. at 180, l. 1-7.  But, the mere fact that someone has gallstones is not an indicator of a need for emergency medical treatment because people can have gallstones for 5, 10, or 15 years and they're generally non-emergent.  *Id*., l. 10-16.

When Askew's complaint came in, Bach did what Dr. Malvasi directed her to do. *Id.*, **PageID#574**, Bach depo. at 113, l. 5-9.[2]

On November 10, 2020, Bach had no further contact with Mr. Askew between midnight on November 9 and the end of her shift at 7:00 a.m. on November 10.  There is no record of any further complaints from Mr. Askew during that time-frame.

MA Bree Bright worked on November 10 from 7:00 a.m. to 4:00 p.m.  MA Jess Johnson worked from 4:00 p.m. to 11:00 p.m. on November 10.  **Doc 94, PageID#5472**.  There's no indication that Mr. Askew required any medical services on November 10, 2020.

On November 11, 2020, at approximately 2:45 a.m., Mr. Askew activated his intercom stating he was having issues breathing and was trying to get ahold of the nurse.  **Doc 72**, Cintron Depo. at pp. 20-21.  CO Cintron called medical and advised MA Tayler Simmons, who indicated she would come and check Mr. Askew's vitals.  *Id.* at pp. 21-22.

MA Simmons saw Mr. Askew and took his vital signs which were BP: 112/76 P: 96 O2 99%.  The vitals were within normal limits.  **Doc 94, PageID#5396**, Simmons depo. at 211, l. 4-19.  Mr. Askew told MA Simmons he has a hernia and showed her a small protrusion on his belly, approximately the size of a quarter.  *Id.*  MA Simmons wrote she would "advise Dr. Malvasi. Continue to monitor." *Id.*  Regarding Mr. Askew's complaint of difficulty breathing, MA Simmons contacted Dr. Malvasi.  *Id.*, **PageID#5397**, Simmons depo. at 212, l. 2-9.

CO Cintron testified that Mr. Askew's vitals were checked again at 04:56 a.m. by MA Simmons.  **Doc 72, PageID#1030**, Cintron depo. at 23, l. 17 to 24, l. 5.

On November 11, 2020, there is a note in the chart by MA Simmons that Mr. Askew was put on the list to see Dr. Malvasi when he comes in per the doctor's order.  Dr. Malvasi came to

---

[2]     There is no clearly established law that the Nurse Defendants' decision to defer to the judgment of their supervising medical providers who had diagnostic and treatment authority "consciously expos[ed] [Majors] to an excessive risk of serious harm."  *Est. of Majors*, 821 F. App'x at 547.

the jail at approximately 6:00 a.m. on November 11, 2020, to see patients. (Ex. A, Malvasi Depo., at p. 103.) Mr. Askew was on the list to be seen. (Ex A, Malvasi Depo at Ex. 22, Doctor Sick Call List.)  One of the COs (either Machingo or Dreier), advised Tayler Simmons that Mr. Askew refused to see Dr. Malvasi [**Doc 94, PageID#5364**, Simmons depo. at 179, l. 3-16], which was then shared with Dr. Malvasi.  **Doc 88, PageID#3833-3834,** Malvasi depo. at 208, l. 2-13; at 209, l. 19-24; **Doc 94. PageID#5368-5369**. Simmons depo. at 183, l. 2-24; at 184, l. 14-24.

MA Simmons explained that there is a refusal form, which she requested the COs co-sign, but they refused to do so.  **Doc 94, PageID#5364**, Simmons depo. at 179, l. 16-24. Subsequently, MA Simmons went to the COs union representative, who agreed with her that it should be filled out, but it still wasn't done.  *Id*., **PageID#5366-5367. 5370**.  In any event, there is no dispute Mr. Askew was not seen by Dr. Malvasi on the morning of November 11.

On November 11, 2020, at approximately 2:04 p.m. CO O'Brien advised medical about Mr. Askew's complaints of stomach issues and asked MA Simmons to see Mr. Askew again. **Doc 90**, Ex. D O'Brien Depo. at p. 81. MA Simmons saw Mr. Askew and noted he was bent over in a lot of pain.  **Doc 94, PageID#5397**. Mr. Askew again showed his "hernia" in his pelvic area that seem larger. *Id.,***PageID# 5398**. MA Simmons documented that she called Dr. Malvasi and LPN Carla Ahart and advised both of the situation. *Id.*

Later on November 11, 2020, at approximately 4:00 p.m., CO Lynn overheard an inmate informing CO O'Hara that Mr. Askew was in distress. **Doc 84, PageID#3307**; see also Lynn Depo Ex 8, Lynn Statement.  CO Lynn went to Mr. Askew's cell, opened the door, and asked Mr. Askew what was wrong. *Id.* Mr. Askew appeared to be in distress and sweating profusely,

having stomach pain and his abdomen felt tight. He informed CO Lynn that he had fallen at work. *Id.* **PageID#3307-3308**. CO Lynn advised Mr. Askew that he would contact medical. *Id.*

CO Lynn advised MA Simmons that Mr. Askew was in distress and medical informed CO Lynn that Mr. Askew was just seen. MA Simmons spoke with CO Lynn and told him she had already assessed Mr. Askew and he is on the list to see Dr. Malvasi. **Doc 94, PageID#5399**. When MA Johnson came in for the next shift which started at 4:00 p.m., CO Lynn encountered Johnson on the elevator at approximately 4:20 p.m. and informed her of his belief that Mr. Askew needed to be seen. **Doc 84, PageID#3350**.

MA Johnson told Lynn that she would check on Mr. Askew after getting updates from her department and she did so. **Doc 76, PageID#1394**, Johnson depo. at 151, l. 10-15. MA Johnson observed that his vitals had been taken an hour before she arrived. *Id*., **PageID#1392, 1394**, Johnson depo. at 149, l 17-22; at 151, l. 16-24. Johnson was able to confirm that Mr. Askew was on the list to see Dr. Malvasi. *Id*., **PageID#1393**, Johnson depo. at 150, l. 2-19. Subsequently, Johnson saw Mr. Askew and informed him he was on the list to see Dr. Malvasi. **Doc 76, PageID#1387**, Johnson depo. at 144, l. 12-16.

CO Machingo first encountered Mr. Askew while conducting temperature checks. **Doc 86, PageID#3494-3495**. Mr. Askew's temperature was within normal limits. CO Machingo was instructed to contact medical if an inmate's temperature was 99 degrees or higher. *Id*.

At approximately 11:10 pm on November 11th, Mr. Askew made his first complaint of stomach pain to CO Machingo. *Id.,* **PageID# 3496**. Mr. Askew stated he was vomiting blood in the toilet. However, Mr. Askew had flushed the contents of the toilet and CO Machingo was unable to see any blood, even after using his flashlight. CO Machingo directed Mr. Askew not to flush the toilet if he vomited again so the CO could verify the contents. *Id.*, **PageID#3495-3496.**

7

After CO Machingo completed his headcount, he informed CO Cullins of what happened. *Id.*, **PageID#3506.** CO Cullins informed CO Machingo that she would alert the medical unit. *Id.*

On November 11th at 11:37 p.m., Mr. Askew activated his intercom and said he was expelling blood. At 11:40 p.m., Cullins contacted MA Bree Bright and informed her Mr. Askew said he was expelling blood. **Doc 82, PageID#3202-3203.** MA Bright informed Cullins that Mr. Askew was up to see the doctor the next morning.

On November 12, 2020, at around 3:47 a.m., Mr. Askew again contacted CO Cullins via intercom indicating he needed help. **Doc 82, PageID#3207.** Before CO Cullins could respond, she heard a thud type noise indicating that Mr. Askew had fallen. *Id.* After calling his name several times, CO Cullins contacted CO Machingo to go into the pod and assess the situation. *Id.*, **PageID#3209.** CO Machingo entered Mr. Askew's cell and was informed by Mr. Askew that he was vomiting blood in the toilet, which CO Machingo viewed to confirm. *Id.,* **PageID#3212.**

At approximately 04:29 am CO Machingo escorted MA Bree Bright to Mr. Askew's cell to evaluate him. **Doc 65-9**, Machingo depo. at 91. While escorting Ms. Bright to Mr. Askew's cell, CO Machingo informed Ms. Bright about his encounter with Mr. Askew earlier in the day. *Id.* at 108. During the interaction between Mr. Askew and Ms. Bright, Mr. Askew did not seem agitated. *Id.* at 95. Mr. Askew told MA Bright that his stomach hurt and that he was pissing and expelling blood. **Doc 65-11**, Brzezinski Depo. at 109. MA Bright told Mr. Askew that his bile was dark but there was no blood in the toilet. *Id.* She also told Mr. Askew he was up to see the doctor in the morning and that she would give him something to settle his stomach. *Id.* at 110.

On November 12, 2020, at approximately 5:35 a.m., CO Machingo interacted with Mr. Askew while passing breakfast trays. **Doc 65-9**, Machingo depo at Ex 13, Machingo Statement.) CO Machingo noted that there was vomit in the toilet with color in it. *Id.* He did <u>not</u> relay this

8

information to medical staff. *Id.*, at 149.  He picked up that breakfast tray at approximately 5:55 a.m. *Id.*, Ex. 13, Machingo Statement.) This information was consistent with the visit accompanying medical staff to Mr. Askew's cell at 4:29 a.m. *Id.*

On November 12, 2020, at approximately 9:50 a.m., Mr. Askew asked CO Greene to use the phone, who informed Mr. Askew he was up next. **Doc 65-12**, Greene Depo., at 27. CO Greene went to Mr. Askew's cell at approximately 10:05 am to inform him he could use the phone, but Mr. Askew did not respond. *Id.*, Greene Depo at Ex. 53 Greene Statement. Upon taking a closer look, CO Greene found that Mr. Askew was apparently not breathing or moving. *Id.* CO Greene radioed CO Cullins to open the cell door and entered. *Id.* CO Cullins radioed for medical indicating Mr. Askew was unresponsive. Additional correctional officers and medical staff arrived at Mr. Askew's cell. *Id.* EMS was also called for Mr. Askew. *Id.* Mr. Askew was taken to the hospital and had surgery which revealed a ruptured duodenal ulcer. Unfortunately, Mr. Askew passed away.

## III.  LAW AND ARGUMENT

**The Medical Defendants are entitled to judgment as a matter of law on Complaint Count I—the Section 1983 deliberate indifference claim.**

### A.  The applicable legal standard:  *Farmer v. Brennan*, 511 U.S. 825 (1994).

In November of 2020[3], Askew was a pretrial detainee. Under the Fourth Amendment (as enforced through the Fourteenth Amendment), a pretrial detainee has a right to be free from officials' deliberate indifference to serious risks of harm.  Plaintiff alleges that all the Medical

---

[3]  "When the date of the conduct at issue predates *Brawner v. Scott Cnty., Tennessee*, 14 F.4th 585, 594 (6th Cir. 2021), `our older decisions applying *Farmer* to the claims of pretrial detainees provide the only clearly established law' as of that time." *Little v. City of Morristown, Tennessee*, No. 23-5302, 2024 WL 1530468, at *3 (6th Cir. Apr. 9, 2024).  The conduct at issue in the Complaint, which occurred in November 2020, predates *Brawner*, which was decided on September 22, 2021.

Defendants were deliberately indifferent to Askew's serious medical needs. **Doc. 1, PageID#19**, Compl. ¶129.[4]

The proper standard for this Court to apply is set forth in _Farmer v. Brennan_, 511 U.S. 825, (1994). The _Farmer_ standard has two parts: (1) an objective component, requiring a plaintiff to prove that the alleged conditions of confinement or deprivation of medical care posed a substantial risk of harm that was "sufficiently serious"; and (2) a subjective component, requiring a plaintiff to show that the official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." _Little v. City of Morristown, Tennessee_, No. 23-5302, 2024 WL 1530468, at *2 (6th Cir. Apr. 9, 2024), citing _Farmer, at 837_. Under the objective component, "[a] sufficiently serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." _Griffith v. Franklin Cnty., Kentucky_, 975 F.3d 554, 567 (6th Cir. 2020). The subjective component requires proof—through either direct or circumstantial evidence—that the official both was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the official also "dr[e]w the inference." _Id._ 837, 842.

Under prior caselaw, the plaintiff had to show that the official "subjectively perceived facts from which to infer substantial risk to the [detainee], that he did in fact draw the inference, and that he then disregarded that risk." _Comstock v. McCrary_, 273 F.3d 693, 703 (6th Cir.

---

[4] Plaintiff alleges, in the alternative, that Askew had an Eighth Amendment right to be free or cruel and unusual punishment. **Doc. 1, PageID#19**, Compl. ¶128. However, since Askew was a pretrial detainee at the time of his death, i.e. a court had yet to try or punish him, the Estate cannot invoke the Eighth Amendment right against "cruel and unusual punishments" because that right kicks in only after a conviction. _Lawler as next friend of Lawler v. Hardeman Cnty., Tennessee_, 93 F.4th 919, 926 (6th Cir. 2024), citing U.S. Const. amend. VIII; _Bell v. Wolfish_, 441 U.S. 520, 535(1979).

2001); *Parsons v. Caruso*, 491 F. App'x 597, 602 (6th Cir. 2012). This presents a high bar, as "[i]t is not enough that an official 'fail[s] to alleviate a significant risk that he should have perceived but did not.'" *Parsons*, 491 F. App'x at 602 (quoting *Farmer*, 511 U.S. at 838).

"Not every deprivation of medical care rises to the level of a constitutional violation." *Berrier v. Lake County, Ohio*, No. 1:22 CV 813, 2024 WL 4591816, at *8 (N.D.Ohio Oct. 28, 2024). "Deliberate indifference requires more than mere negligence, more even than medical malpractice." *Magby v. Fender*, No. 1:22 CV 00019-DAR, 2022 WL 1521909, at *5 (N.D.Ohio May 13, 2022). "Recklessness, negligence, and accident are insufficient to support a claim for deliberate indifference under the Eighth Amendment, or a pre-2021 claim under the Fourteenth Amendment." *Berrier*, 2024 WL 4591816, at *5. "[A] doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference." *Griffith*, 975 F.3d at 568. "It requires something akin to criminal recklessness." *Mitchell v. Hininger*, 553 F.App'x 602, 604 (6th Cir. 2014).

Accordingly, "[w]here the plaintiff has received **some** medical treatment, 'federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013); *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018)("[W]hen a claimant challenges the adequacy of an inmate's treatment, 'this Court is deferential to the judgments of medical professionals.'"); *Mason v. Eddy*, No. 1:18 CV 2968, 2019 WL 3766804, at *13 (N.D.Ohio Aug. 9, 2019)("When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.").

**B.     None of the Defendants "subjectively perceived facts from which to infer substantial risk to the [detainee], that he [or she] did in fact draw the inference, and that he [or she] then disregarded that risk."**

"[E]ach Government official ... is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  A defendant's individual liability "must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others." *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991).

1.     Dr. Malvasi and/or Malvasi, LLC was not deliberately indifferent.

*a.     Dr. Malvasi's capacity as medical provider.*

As noted in the Statement of Facts, Dr. Malvasi was kept apprised of Mr. Askew's physical condition by the MAs.  When it appeared that Mr. Askew was dehydrated, Dr. Malvasi instructed MA Bach to push fluids.

When Mr. Askew continued to experience symptoms and it was reported that he had a hernia about the size of a quarter, he was on Dr. Malvasi's list to be seen on the morning of November 11.  Dr. Malvasi testified that a hernia of that size is not indicative of an obstruction or a perforation, and that it would not be an emergency at all.  **Doc 88, PageID#3860**.  However, that morning, the COs reported to Tayler Simmons that Mr. Askew refused to see Dr. Malvasi, which was in turn was communicated to Dr. Malvasi.  Dr. Malvasi can't force an inmate to see him. *Id*.**, PageID#3866**, Malvasi depo. at 241, l. 18-19.

There's no evidence that Dr. Malvasi subjectively perceived facts from which to infer substantial risk to Mr. Askew, that he did in fact draw the inference, and that he then disregarded that risk.  To the contrary, as Mr. Askew's condition deteriorated during the evening of November 11 and morning of November 12, he was never contacted.  At no time during her shift on November 11-12 did MA Bree Brzezinski contact Dr. Malvasi about Mr. Askew vomiting

blood or expelling bile.  **Doc 70, PageID#880**, Bree Brzezinski depo. at 140, l. 4-8.  She didn't contact LPN Ahart either.  *Id*., **PageID#867**, depo. at l. 127, l. 11-16.  Since he was unaware of Mr. Askew's worsening condition, he cannot be said to have disregarded a known substantial risk.

> b.    *Malvasi, LLC as employer-supervisor of the jail medical staff.*

Section 1983 liability of supervisory personnel "must be based on more than the right to control employees and will not be imposed solely upon the basis of *respondeat superior*. There must be a showing that the supervisor "encouraged the specific incident of misconduct or in some other way directly participated in it." *Griffith*, 975 F.3d at 579. Accordingly, "a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Id*., 975 F.3d at 579 (6th Cir. 2020), citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)(quoting *Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 873 (6th Cir. 1982).

In this case, all of the MAs except Bree Brzenzinski contacted Dr. Malvasi for advice and direction.  As explained in further detail hereafter, none of them can be said to have been deliberately indifferent to Mr. Askew's medical needs.  As such, Malvasi, LLC and/or Dr. Malvasi cannot have been said to have approved or knowingly acquiesced in the alleged unconstitutional conduct of the LLC's employees.

> 2.    <u>LPN Carla Ahart and MA Jennifer Bach were not deliberately indifferent.</u>

For the sake of brevity, these Movants incorporate their arguments, infra, as to why they were not negligent, let alone deliberately indifferent, and therefore entitled to summary judgment

on Plaintiff's entire Complaint. In other words, *a fortiori*, absent even negligence, a deliberate indifference claim against them necessarily fails for the same reasons.

3. MA Jess Johnson was not deliberately indifferent.

MA Jess Johnson worked from 4:00 p.m. to 11:00 p.m. on November 10. There's no indication that Mr. Askew required any medical services on November 10, 2020.

When MA Johnson came into work at 4:00 p.m. on November 11, 2020, she encountered CO Lynn who expressed concern about Mr. Askew. MA Johnson told Lynn that she would check on Mr. Askew after getting updates from her department and she did so. **Doc 76, PageID#1394**, Johnson depo. at 151, l. 10-15. MA Johnson observed that his vitals had been taken an hour before she arrived. *Id.*, **PageID#1392, 1394**, Johnson depo. at 149, l 17-22; at 151, l. 16-24. All Mr. Askew told Johnson was that he had an upset stomach or that it hurt. *Id.*, **PageID#1396**, Johnson depo. at 153, l. 8-16.

Johnson was able to confirm that Mr. Askew was on the list to see Dr. Malvasi. *Id.*, **PageID#1393**, Johnson depo. at 150, l. 2-19. Subsequently, Johnson saw Mr. Askew and informed him he was on the list to see Dr. Malvasi. **Doc 76, PageID#1387**, Johnson depo. at 144, l. 12-16. Mr. Askew's next complaint of stomach pain didn't occur until 11:10 p.m.—after Johnson had already left—and was to CO Machingo. **Doc 86, PageID#3496.**

Based upon MA Johnson's interaction with Mr. Askew, it cannot be said that MA Johnson subjectively perceived facts from which to infer substantial risk to Mr. Askew, that she did in fact draw the inference, and that she then disregarded that risk.

4. MA Tayler Simmons was not deliberately indifferent.

There is no evidence that MA Simmons subjectively perceived facts from which to infer substantial risk to Mr. Askew, thats he did in fact draw the inference, and that she then

14

disregarded that risk.  When MA Simmons first encountered Mr. Askew, who complained of difficulty breathing, she took his vital signs (blood pressure, oxygen level, and pulse).  All were within normal limits and a 99% pulse ox result is objective evidence that Mr. Askew's breathing was normal.  Subsequently, she continued to monitor Mr. Askew's vital signs and made sure that he was on Dr. Malvasi's list to be seen on the morning of November 11.

During that afternoon, around 3:00 p.m., when Simmons was informed that Mr. Askew was complaining of stomach pain, she performed an assessment, took his vital signs, and contacted Dr. Malvasi about the fact that his hernia seemed larger.  Simmons knew that Mr. Askew remained on Dr. Malvasi's list to be seen.  **Doc. 94, PageID#5399**, Simmons depo. at 214, l. 6-14.

### 5.     MA Bree Brzezinski was not deliberately indifferent.

In the evening of November 11, Brzezinski came on shift at 11:00 p.m.  Brzezenski was first contacted approximately 11:40 p.m. by Officer Cullins regarding Mr. Askew's complaints and he was told Dr. Malvasi would be there in the morning, which in turn he shared with Mr. Askew.  **Doc 90, PageID#5086**.

On November 12 at approximately 3:55 a.m., CO Machingo summoned Brzezinski to to check on Mr Askew.  *Id*.  Brzezinski advised she would write an order for some OTC medication for Mr. Askew's stomach.  *Id*.  While there, she was unable to confirm that Mr. Askew was vomiting blood.  Rather, she saw mucus that looked brown.  **Doc 70, PageID#859-860**, Brzezenski depo. at 119, l. 18 to 120, l. 4.  She believed, albeit mistakenly, that what she observed was bile, not blood.  **Doc 90, PageID#5086**.  While it is true that MA Brzezinski did not contact Dr. Malvasi or LPN Ahart regarding Mr. Askew's vomiting, she had a reason for

15

not doing so.  Brzezinski believed that Dr. Malvasi would be in the Jail in the morning to see Mr. Askew.

After the 3:55 a.m. encounter with Mr. Askew, Brzezinski was never asked to see Mr. Askew for at least six hours.  **Doc 90, PageID#5087**. And indeed, CO Greene reported that Mr. Askew sounded completely fine at 9:50 a.m.  *Id*.

**Two of the Individual Defendants, LPN Ahart and MA Bach, are entitled to summary judgment on Plaintiff's entire Complaint.**

"[E]ach Government official ... is only liable for his or her own misconduct."  *Ashcroft, 556 U.S. at 677*.  A defendant's individual liability "must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others." *Gibson, 926 F.2d at 535*.

A.    Defendant Carla Ahart is entitled to summary judgment.

What the record reveals is that LPN Ahart had almost no involvement whatsoever in the care and treatment of Askew.  Between November 6 and November 12, Ahart was never at the Trumbull County Jail:

> Q.    Okay. From November 6th through 12th, 2020, did 6 you ever physically set foot inside Trumbull 7 County Jail?
>
> A.    November 6th through what?
>
> Q.    12th, 2020.
>
> A.    No, I think I came in after.[5]

Ahart depo. at 80, l. 5-10.  Ahart had no recollection of having any knowledge of Askew's medical status:

---

[5]    The "after" being a reference to after Askew's death.

> Q.    Okay. Do you know anything about his medical symptoms and complaints while in the jail?
>
> A.    No.

Ahart depo. at 147, l. 14-16.   That's consistent with what the Medical Assistants testified. Several of them never spoke with Ahart about Askew.  **Doc 70, PageID# 867**, Brzezinski (Bright) depo. at 127, l. 14-16; at 136, l. 19-20 ("I went directly to doc. I did not deal with Carla."); **Doc 68**, **PageID#496**, Bach depo. at 34, l. 16-18 (opted to contact the doctor directly rather than to contact her); **PageID#496**, at 35, l. 9-11, 15-18 (because she's not a doctor and can't give orders); **Doc 76, PageID#1395**, Johnson depo. at 152, l. 21-22 (did not contact Ahart or Dr. Malvasi regarding her interaction with Askew).

One M.A., Tayler Simmons, contacted Ahart multiple times, but except once, Simmons could not recall receiving a response or actually talking to Ahart. **Doc 94, PageID#5308**, Simmons depo. at 123, l. 16-19 (generally, not always able to get through to Ahart when she was called); **PageID#5354**, at 169, l. 15 to 170, l. 5 (no recollection of any response from Dr. Malvasi or Nurse Ahart and any response 'would have been whoever was on shift at that point"); **PageID#5379**, at 194, l. 9-13 (no recollection whether Dr. Malvasi or Nurse Ahart responded at any time after your shift was over about the issues you raised to them about Askew); **PageID#5396-5397**, at 211, l. 6 to 212, l. 11 (took Askew's vitals in response to his complaint of difficulty breathing and advised Dr. Malvasi of the complaint via a call and text, and also called Ahart, but no indication whether Simmons actually spoke with Ahart about this issue).

There was only one occasion where Simmons was able to recall talking to Ahart and that was about Askew's complaint that he was in a lot of pain and her observation that the hernia seemed larger than previously.  **Doc 94, PageID#5397**, at 212, l. 12 to 213, l. 1.  However, Simmons also spoke to Dr. Malvasi [at 212, l. 2-10], and Askew was placed on Dr. Malvasi's list

to see Askew.  *Id.*, **PageID#5398**, at 214, l. 3-10.  There wouldn't have been anything else for LPN Ahart to do in that circumstance.[6]

      B.     <u>Jennifer Bach is entitled to summary judgment</u>.

A medical assistant can only perform those tasks which they are licensed to perform. Thus, their scope of practice was limited.  Dr. Malvasi explained that the MAs employed by Malvasi, LLC did the following:

> Q.     What was the role of the medical assistant in your jail medical unit in November 2020?
>
> A.     Med pass, pass medication, TB test, 14-day evaluations, drug screen urines for courts, blood sugar checks, blood pressure checks, blood draws, EKGs, that's to name a good start.

**Doc 88, PageID#3675**, Malvasi depo. at 50, l. 18-23.  An MA, including Jenn Bach, would not be qualified to diagnose what treatment would be appropriate in response to symptoms.  **Doc 68, PageID#564-565**, Bach depo., at 103, l. 23 104, l. 5.

In this case, Bach's shift, which started on November 9 at 3:00 p.m., ended on November 10 at 7:00 a.m.  **Doc 68, Pltf's Ex. 21, PageID#715**.  Bach doesn't believe that she ever saw Askew. **Doc. 68, PageID#569**, Bach depo. at 108, l. 6-16.  Bach believes she completed some documentation regarding Askew, but the services performed did not necessitate Bach see Askew. *Id*. at l. 17-20.

On November 9, 2020, all Bach did was process a urinalysis test result and forward same to Dr. Malvasi to review.  Bach's note states:

> Q.     This "jb" here on the response, "11/09/20, 17:54" is the time. The "Note" says, "Already brought down for UA. Doctor says to keep pushing plenty of fluids, jb," is that what you're referencing?

---

[6]     There is no clearly established law that the Nurse Defendants' decision to defer to the judgment of their supervising medical providers who had diagnostic and treatment authority "consciously expos[ed] [Majors] to an excessive risk of serious harm."  *Est. of Majors v. Gerlach*, 821 F. App'x 533, 547 (6th Cir. 2020).

A.     Yes.

*Id.*, Bach depo. at 109, l. 11-17. Bach explained that Askew, via the electronic kiosk, complained about real bad pain and having a gallstone.[7]  *Id.*, **PageID#571**, Bach depo. at 110, l. 1-3.  But prior to that complaint, Askew had already been brought to the medical department for an urinalysis test, which does not require the inmate to see the MA.  *Id.*, l. 10-19; **PageID#573**, Bach depo. at 112, l. 4-7, 18-21.  When Askew's complaint came in, Bach did what Dr. Malvasi directed her to do. *Id.*, **PageID#574**, Bach depo. at 113, l. 5-9.[8]  Bach testified that had Dr. Malvasi instructed her to put Askew on the "sick call" list, she would have done so, but Dr. Malvasi did not do so.  *Id.*, **PageID#589**, Bach depo. at 128, l. 3-11.  As noted previously, Askew had no complaints on November 10 between midnight on the 9th and 7:00 a.m. on the 10th when Bach's shift ended.

Dr. Malvasi confirmed MA Bach's version of the events:

Q.     Okay. All right. So looking at this particular request, what we see here is a request for Mr. Askew saying, having real bad pain, I have a gallstone, right?

A.     Yes.

Q.     And the response written here is, from the medical staff is, already brought down for UA, that means urinalysis, right? Correct?

A.     Yes.

Q.     And then, doctor says to keep pushing plenty of fluids, that was your order conveyed to the medical assistant at the time, right?

---

[7]     Dr. Malvasi explained that the only way Askew could know that he had a gallstone issue is if he had previously been tested.  **Doc 88, PageID#3805**, Malvasi depo. at 180, l. 1-7. But, the mere fact that someone has gallstones is not an indicator of a need for emergency medical treatment because people can have gallstones for 5, 10, or 15 years and they're generally non-emergent.  *Id.*, l. 10-16.

[8]     There is no clearly established law that the Nurse Defendants' decision to defer to the judgment of their supervising medical providers who had diagnostic and treatment authority "consciously expos[ed] [Majors] to an excessive risk of serious harm."  *Est. of Majors*, 821 F. App'x at 547.

    A.      For the urine, correct.

    Q.      Tell me about the interaction you had with Jennifer Bach to provide that order.

    A.      I believe it was a text message.

    Q.      Okay. And what did she say?

    A.      She didn't say anything, she just texted me the urine.

    Q.      The results from the urinalysis?

    A.      Yes.

    Q.      And what was your response?

    A.      Have him keep pushing fluids.

    Q.      Anything other than that?

    A.      Not that I recall.

**Doc 88, PageID#3843-3844**, Malvasi depo. at 218, l. 2 to 219, l. 1. Bach would have understood

Dr. Malvasi's directive to keep pushing fluids as being water:

    Q.      When you say pushing fluids, do you mean like an IV or Gatorade or what do you mean?

    A.      Water, hydration.

*Id*., **PageID#3844**, Malvasi depo. at 219, l. 20-22.  And, based upon the urinalysis result, Dr.

Malvasi concluded:

    Q.      Okay. And you didn't see a need for any evaluation by you or any other provider in response to these urinalysis results?

    A.      No.

    Q.      Okay. So you didn't ask for any further information or exam or evaluation to be done by Jennifer Bach or any other medical assistant, right?

    A.      I don't think so.

*Id.*, **PageID#3853**, Malvasi depo. at 228, l. 2-9.

> Q.     You didn't contemplate at that time that he may need any medical care or services, right?

> A.     I don't believe so.

> Q.     You don't contemplate that he may be presenting with an urgent or emergent medical condition, correct?

> A.     Nothing urgent in that.

> Q.     And his symptoms at the time were not concerning to you, were they?

> A.     Looking at the urine, no.

*Id.*, Malvasi depo. at 228, l. 16-25.

There isn't anything that indicates Bach was negligent.  Bach performed work that was within the scope of her licensure, shared the information with Dr. Malvasi, who then provided her with instructions on how to proceed.

## IV.    <u>CONCLUSION</u>

Regarding Complaint Count I, Plaintiff cannot establish that any of the Medical Defendants were deliberately indifferent, *i.e.* that any of them "subjectively perceived facts from which to infer substantial risk to Mr. Askew, that they did in fact draw the inference, and that they then disregarded that risk."

Given their rather limited involvement, neither LPN Ahart nor MA Bach can be liable to Plaintiff upon any of the claims in the Complaint.  As such, they should each be dismissed as party Defendants.

Respectfully submitted,

*/s/ John D. Latchney*
John D. Latchney (0046539)