**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ESTATE OF ALFONSO ASKEW, | ) | CASE NO. 4:21-cv-02133 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| TRUMBULL COUNTY, *et al*., | ) | |
| | ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |
| | ) | |
| | ) | |

## I. Procedural History

The Estate of Plaintiff of Alfonso C. Askew ("Plaintiff") has filed a six-count Complaint

against the following: Trumbull County, Dr. Phillip Malvasi D.O., LLC ("Malvasi LLC"),

Phillip Malvasi, D.O., Tayler Simmons, Bree Bright, Jess Johnson, Carla Ahart, Nurse and/or

Medical Assistant Jennifer Bach, and correctional officer Doug Machingo. (R. 1). The Complaint

raises the following causes of action: (1) a 42 U.S.C. § 1983 claim against all Defendants

alleging deliberate indifference to Askew's serious medical needs; (2) a state law medical

malpractice claim against all the Medical Defendants[1]; (3) a state law negligence claim against

---

[1] The Complaint identifies the Medical Defendants as Dr. Malvasi; medical assistants Simmons, Bright, Johnson; and nurse and/or medical assistants Ahart and Bach. (R. 1, PageID# 22, ¶142). Regarding Bach, the court issued an "Order [non-document] granting Plaintiff and Defendant J.B.'s unopposed Motion to Amend Complaint and Answer by Interlineation Instanter. (Related Doc # 32 ). All references to 'J.B.' and 'Jennifer Bass' in the Complaint…and Answer…are amended to state "'Jennifer Bach.'" *See* Docket entry 2/9/2023.

Dr. Malvasi and Malvasi LLC; (4) a state law negligence claim against corrections officer Machingo; (5) a state law wrongful death claim pursuant to O.R.C. § 2125.02 against all Defendants; and, (6) a state law survivorship claim pursuant to O.R.C. § 2305.21 against all Defendants. (R. 1).

Defendants Trumbull County and Officer Machingo moved for summary judgment with respect to all counts asserted against them — Counts One, Four, Five, and Six. (R. 65). Defendants Malvasi LLC, Dr. Malvasi, Ahart, Simmons, Bach, Johnson, and Bright filed a motion for *partial* summary judgment labeling themselves the "Medical Defendants." (R. 95). All the Medical Defendants move for summary judgment with respect to Count One. (R. 95, PageID# 5529). In addition, Defendants Ahart and Johnson move for summary judgment with respect to all other claims against them. *Id*. Plaintiff filed briefs opposing both motions (R. 106 & 107), and Defendants filed replies supporting their respective motions. (R. 112 & 113).

## II. Summary of Key Facts[2]

Trumbull County contracts with Malvasi LLC to provide medical services to inmates at the Trumbull County jail. (R. 88, PageID# 3659, Malvasi Depo. at 33).

On November 6, 2020, Askew was booked into the Trumbull County jail for a probation violation.  As part of the booking and medical screening process, Askew reported that he was taking medication. (R. 90, PageID# 5085, Exh. 3). He did not report any medical issues, nor did he mention any history of having ulcer problems. *Id.*

During the late afternoon of November 9, 2020, Askew complained via an electronic medical kiosk in the jail about having "real bad pain" and a "goal [sic] stone."  (R. 68, PageID#

---

[2] The Court's recitation of the facts is not intended to be exhaustive.

637, Bach Depo., Exh. 4). Defendant Jennifer Bach, a medical assistant employee of Malvasi LLC, was on duty at the time—her shift ran from 3:00 p.m. on November 9, 2020, until 7:00 a.m. on November 10. *Id.* at PageID# 640, Bach Depo., Exh. 16. Though Bach does not remember whether she then personally saw Askew, she did complete a urinalysis of Askew soon after his complaint. *Id.* at PageID# 571–72. In her deposition, Bach stated that Askew was brought down for the urinalysis *prior* to his kiosk complaint. *Id.* at PageID# 573. Plaintiff summarized the findings of its expert, Dr. Jeffrey Keller, as follows: "Askew's urinalysis results were grossly abnormal, showing large amounts of blood, ketones and protein, a high specific gravity and a small amount of bilirubin and uroblinogen." (R. 106, PageID# 6046, citing R. 74 at PageID# 1218 (Keller Report), and R. 74 at 711 (Urinalysis Report, Depo. Ex 20)).

Bach testified in her deposition that she either called Dr. Malvasi regarding Askew's complaint or sent Dr. Malvasi a photo of the urinalysis results. (R. 68, PageID# 574; *see also id.* at PageID# 588). Dr. Malvasi instructed that Askew should continue to push fluids. *Id.* at PageID# 589. Apart from that directive, which Bach registered in the online kiosk portal, there is no further documentation indicating that she contacted Dr. Malvasi regarding Askew's complaint and she herself does not remember whether she did so. (*Id.* at PageID# 575, 591–92; R. 106, PageID# 6046). Bach admits that if she had a face-to-face encounter with Askew to encourage him to push fluids, it normally would be documented, but no documentation of such an interaction exists. (R. 68, PageID# 591-92). Nor is there any evidence that Bach took any further steps in relation to Askew's care. For example, she did not place Askew on the sick call list—a list containing patient names, location, and their medical issues that Dr. Malvasi would rely on when he visited the jail (R. 68, PageID# 724–31)—to see Dr. Malvasi. (R. 68, PageID# ID 588). And although Bach noted in her electronic kiosk response that Askew should push

fluids (such that Askew would only see that response the next time he accessed the kiosk), she did not personally advise Askew of Dr. Malvasi's directive to push fluids or what that instruction specifically entailed. *Id.* at PageID# 591–92.

On November 10, 2020, medical assistant Bright worked the 7:00 a.m. to 4:00 p.m. shift. (R. 68, PageID# 640). She testified that she added Askew's name to the sick call list, though she cannot remember when. (R. 70, PageID# 867). Askew's name does appear on the sick call list. (R. 68, PageID# 729). Askew did not register any further complaints on November 10, 2020.

On November 11, 2020, sometime around 2:45 a.m., Askew activated the intercom in his cell and reported to correctional officer ("CO") Bernice Cintron that he was having difficulty breathing and that he had been trying to see a nurse. (R. 72, PageID# 1031, Cintron Depo. at 27-28). Medical assistant Defendant Tayler Simmons was on duty at the time, as she was working from 11:00 p.m. on November 10 to 4:00 p.m. on November 11, 2020—a double fifteen-hour shift. (R. 68, PageID# 640). CO Cintron called the medical unit, relayed this information to Simmons, and asked Simmons to come evaluate Askew. (R. 72, PageID# 1031-32). Simmons testified that based on her conversation with Cintron, she understood that Askew "was upset" and "was hurting" and that the situation was "urgent." (R. 94, PageID# 5333–34).

Upon Simmons's arrival to Askew's cell, Askew complained that he was in pain and showed Simmons a quarter-size protrusion on his stomach. *Id.* at PageID# 5335. Simmons took Askew's vitals and looked at the protrusion, but did not physically touch, poke, or prod. *Id.* at PageID# 5336–37. Simmons asked Askew about the protrusion, and he responded by indicating he had been dealing with a hernia for some time, and believed this episode was a flare-up. *Id.* at Pg. ID 5337.

After leaving Askew's cell, Simmons called Dr. Malvasi on his cell phone, who did not

4

answer, so she left him a message. *Id.* at PageID# 5337.  Although Simmons said she called Dr. Malvasi a few times, he did not call Simmons back at any point during her double-shift. *Id.* at PageID# 5339-40.

Simmons also testified that she called and texted Licensed Practical Nurse (LPN) Carla Ahart, another employee of Malvasi LLC, who supervised the medical assistants alongside Dr. Malvasi himself, but she did not answer. (R. 94, PageID# 5340; R. 101, PageID# 5684, 5705-07 Ahart Depo.) Ahart acknowledged that MAs were to call her or Dr. Malvasi when they were unsure how to handle a patient complaint. (R. 101, PageID# 5726–27). Defendant Ahart, who had been commuting from Indiana, was not physically present at the jail between November 6 through November 12, 2020, but was on call 24/7 to answer MAs' questions. (R. 101, PageID# 5683, 5748, 5780, 5814; R. 68, PageID# 495; R. 76, PageID# 1258). Ahart testified that she routinely would answer calls in the middle of the night, and that if she missed a call, she tended to call back quickly.  *Id.* at Pg. ID 5780-81. Contrary to Simmons's testimony, Ahart contends that she never received a call from the jail regarding Askew, or specifically a call or text from Simmons, from November 6 through November 12, 2020. (R. 101, PageID# 5810-11).[3] Ahart also testified she never spoke with Dr. Malvasi about Askew at any point during Askew's stay at the jail, but only after he was transported to the hospital. (R. 101, PageID# 5813).

Turning back to Simmons, she indicated she "was concerned" for Askew, and checked on him a few hours later. (R. 94, PageID# 5346–47). The protrusion on his stomach had grown larger, (R. 94, PageID# 5351), but Askew reported that the pain had improved. *Id.* at PageID#

---

[3] *But see* R. 101, PageID# 5811 (Ahart initially testified that she does not remember whether Simmons called her soon after responding "no" to a question whether Simmons or other medical staff had contacted her at all regarding Askew); *id.* at Pg. ID 5812 ("I do not remember.").

5353. She did not remember whether she took Askew's vitals during this second interaction. *Id.*

Soon thereafter, Dr. Malvasi was at the jail for approximately 35 minutes—from 6:10 a.m. to 6:44 a.m. (R. 80, PageID# 2402, Mason Depo. Exh. 31). Although Dr. Malvasi had purportedly been advised of Askew's issues by both Defendants Bach and Simmons, he did not see Askew. The reasons why Askew was not seen by Dr. Malvasi during his November 11, 2020 visit are in dispute. (R. 106, PageID# 6051).

It is Defendants' contention that Askew refused to see Dr. Malvasi on the morning of November 11, 2020, for unidentified reasons. Simmons testified that she spoke with Dr. Malvasi concerning Askew that morning, but a correctional officer, either Machingo or Dreier, indicated that Askew refused to see Dr. Malvasi. (R. 94, PageID# 5364). Simmons testified she filled out a refusal of treatment form, but that the correctional officer stated he wanted to run it by his union representative before signing; she never got the form back. *Id.*[4] Dr. Malvasi also testified that Askew was on his list of patients to see, that he never came down to see him, and that he was told by prison personnel that Askew refused to see him. (R. 88, PageID# 3833). He stated that he was "sure" Askew refused to see him, as "inmates refuse to come down all the time" to see him. *Id*.

According to Major Daniel Mason, who offered binding testimony on behalf of Trumbull County, there is no documentation to show that Askew refused to see Dr. Malvasi or that he refused to come to sick call during this time. (R. 80, PageID# 1696, 1827).  Major Mason testified that he had never heard that a correctional officer declined to sign a refusal form as a

---

[4] Simmons reports that she then checked with a union representative, and the representative seems to have agreed with her that the officer could fill out the form; the representative added that he would check with the officer.  (R. 94, PageID# 5366–67). Simmons never heard back from either the officer or the representative. *Id.* at PageID# 5370.

witness for Askew's alleged refusal of medical care. *Id.* at PageID# 1828. Mason added that Trumbull County would disagree with testimony from medical assistants that an officer refused to sign a refusal form. *Id.* at 1828–29. Mason also testified that he had never heard that there was a union representative who was supposed to advise or respond somehow in relation to the issue of a correctional officer declining to sign a refusal form relating to Askew, as "that wouldn't be a contractual issue." *Id.*

Plaintiff maintains that there are disputed reasons as to why Askew did not see Dr. Malvasi on the morning of November 11, 2020. (R. 106, PageID# 6051). Though Plaintiff may be overstating the level of actual *conflicting* evidence, to be sure there is no documentary evidence *corroborating* the testimony of Simmons and Dr. Malvasi that Askew refused to see the physician (R. 80, PageID# 1696, 1827), and such a position is inconsistent with Askew's earlier requests for care.

According to the Coroner's Report, sometime on November 11, 2020, "[d]uring an outgoing phone recording Mr. Askew was crying while speaking to his wife and stated 'I'm dying ... my stomach is killing me ... Oh my god I'm in so much pain." (R. 80, PageID# 2405, Exh. 32).  The same day, Askew again registered complaints of stomach pain and a correctional officer notified Simmons, who checked on Askew.  (R. 94, PageID# 5397-98).  According to Simmons's notes, she found Askew bent over in pain, and noticed that the protrusion on his stomach seemed larger than the last time she checked on him. *Id.* at 5397–98.  Simmons's notes add that she called both Dr. Malvasi and LPN Ahart to advise them of the situation, and she testified that she talked to both of them.  *Id.* at PageID# 5398.

Later that afternoon, according to an email from correctional officer Joseph Lynn, he overheard another inmate telling a fellow correctional officer that Askew was in severe distress.

(R. 84, PageID# 3413, Exh. 8). Lynn checked on Askew and found him nude, sweating, and sharply breathing. *Id.* Lynn's email states that Askew reported that his pain began when he had fallen at work the day before being arrested, and he had not sought medical attention. *Id.* Lynn testified that the other inmates had been yelling and banging on their cells demanding that Askew be given medical care.  *Id.* at PageID# 3306–07. Lynn called for medical assistance and said that Askew had to be seen; Simmons responded that she had recently seen Askew and that she was in the midst of trying to contact the doctor. (R. 84, PageID# 3308; R. 94, PageID# 5387, 5390–91, 5399). Simmons's notes square with this account; she wrote that she "advised CO Lynn [that] inmate was already assessed, ibuprofen was ordered, and is on Dr. Malvasi's list." R. 94, Pg. ID 5399.  In her deposition testimony, Simmons vouched for the accuracy of her notes. (R. 94, PageID# 5399). She added that she did not hear back from Dr. Malvasi prior to the end of her shift. *Id.* at PageID# 5393–94.

Corrections officer Lynn talked to medical assistant Jess Johnson (who had recently arrived for her 4:00 p.m. to 11:00 p.m. shift, replacing Simmons) and informed her of his opinion that Askew "needed to be assessed." (R. 84, PageID# 3413; R. 76, PageID# 1385-86, 1419–20, Johnson Depo.). When saw Askew, she did not "remember him being in a distressed state of mind or anything like that or physically distressed," but he complained that his stomach hurt, and she informed him that he was on the list to see Dr. Malvasi. (R. 76, PageID# 1389, 1393). Johnson does not recall whether she asked Askew any further questions or conducted any sort of physical examination of him, and she did not record any vitals. (R. 76, PageID# 1391). She does not recall contacting either LPN Ahart or Dr. Malvasi. *Id.* at PageID# 1395.[5]

---

[5] Simmons, for her part, testified that she told Johnson that Askew needed to be monitored. (R. 94, PageID# 5409). She added that Askew "was supposed to be on 10-minute medical watch," per Dr.

Johnson also spoke with Askew's wife on the phone during her shift, as she had called the jail multiple times worried about her husband's health. (R. 76, PageID# 1416-18). Johnson informed her that Askew was on the list to see the doctor. *Id*. She did not contact Dr. Malvasi or LPN Ahart, nor did she recall telling jail staff to keep an eye on Askew. (R. 76, PageID# 1425-26). Johnson's shift ended at 11:00 p.m. on the evening of November 11, when she was replaced by medical assistant Bree Bright.  (R. 68, PageID# 640). Bright's shift lasted from 11:00 p.m. on November 11 to 7:00 a.m. on November 12, 2020. *Id*.

Soon after Bright's shift began, correctional officer Machingo was conducting a prisoner headcount when Askew told CO Machingo that he was sick and that there was blood in his vomit. (R. 86, PageID# 3498-3499).  After inspecting the contents of Askew's toilet, Machingo saw no color or contents in the toilet and advised Askew to not flush the toilet if he vomited again and to use the intercom if he needed anything.  *Id*. After completing his headcount, Machingo informed correctional officer Sheila Cullins about his interaction with Askew; according to Machingo, Cullins said she would inform the medical staff.  *Id.* at PageID# 3506.

According to an email Cullins had written from John Greene's email account Askew took Machingo's advice regarding the intercom: at 11:37 p.m., Askew activated the intercom and informed Cullins that he was urinating and expelling blood. (R. 78, PageID# 1657-58, 1681, Exh. 12). Minutes later she called Bright advising her of Askew's statement. *Id.* Bright told Cullins to tell Askew that he would see the doctor in the morning, and Cullins informed Askew accordingly. *Id.*

_____

Malvasi's directive (though she cannot remember when Dr. Malvasi gave that direction, and she acknowledges that Dr. Malvasi's instructions were not documented in the shift report). *Id.* at PageID# 5409–10. Nor did she recall giving the correctional officers any instructions that Askew was to be placed on 10-minute medical watch. *Id.* at PageID# 5412–13.

9

A few hours later, at about 3:47 a.m. on November 12, 2020, Askew again activated his intercom and pleaded that he needed help. (R. 78, PageID# 1681). Before Cullins could respond, she heard a thud as Askew fell forward and hit his cell door. *Id.* Cullins yelled Askew's name and did not receive a response, so she sent officer Machingo to check on him. *Id.* Machingo did so, and he found Askew lying near the toilet; Machingo checked the toilet and saw blood in Askew's vomit—about which he advised Cullins. (R. 78, Pg. ID 1681; R. 82, PageID# 3212-13). Cullins, in turn, advised Bright of the situation. (R. 78, PageID# 1681). Accompanied by Machingo, Bright checked on Askew. *Id.* Askew told Bright that he was urinating and expelling blood. *Id.* After seeing Askew lying on the floor of his cell, Bright inspected the toilet. She told Askew that she believed it was bile, not blood, and that Askew would see the doctor in the morning. (R. 78, PageID# 1681; *see also* R. 68, PageID# 720). In her deposition, Bright testified that she was not sure whether the brownish discoloration in Askew's vomit was blood or bile. (R. 70, PageID# 876). Bright did not perform any sort of evaluation of Askew, nor did she call Dr. Malvasi. (R. 70, PageID# 862–64). According to Machingo, she told Askew she would get him some medication to help with his stomach.  (R. 86, PageID# 3622).

Around 5:35 a.m. the same day, Machingo saw Askew when he dropped off a breakfast tray. Machingo noted that Askew was still lying on the floor and there was colored vomit in the toilet again. (R. 86, PageID# 3622, Exh. 13).

Later that morning of November 12 at around  10:00 a.m., a correctional officer went to Askew's cell so that Askew could make a phone call and take a shower, but Askew was found unresponsive. Medical assistant Simmons was summoned—she had taken over for Bright at 7:00 a.m.— and had not yet checked on Askew during the intervening three hours. (R. 94, PageID# 5378–79). CPR was performed and EMS was summoned. Askew died early the next morning on

10

November 13, 2020.

The Trumbull County Coroner's Office concluded that Askew died from shock "due to prolonged rupture of the proximal duodenum complicating peptic ulcer disease." (R. 80, PageID# 2407). Plaintiff's experts, Dr. Jeffrey Keller and Dr. Ralph Silverman, agreed and concluded that Askew's death was a preventable result of his not receiving proper care during his time in jail. (R. 74, PageID# 1225–36, Keller Depo. Exh. A; R. 92, PageID# 5171–72).

### III. Summary Judgment Standard

Summary judgment is appropriate only if the moving party demonstrates there is no genuine dispute of material fact on an issue that would entitle the movant to judgment as a matter of law. Fed.R.Civ.P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the non-movant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is only genuine, however, if a reasonable jury could resolve the dispute and return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV. Law and Analysis

Each Defendant's liability must be assessed on an individual basis. *Howell v. NaphCare, Inc.*, 67 F.4th 302, 312 (6th Cir. 2023). The court takes each Defendant in turn, starting with the medical defendants and then moving onwards to Defendants Machingo and Trumbull County.

Before doing so, though, the court addresses some threshold issues that will structure its analysis of the various Defendants' motions for summary judgment.

A.    **The Medical Defendants Can Be Held Liable Under § 1983**

"The principle is well settled that private medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983." *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (*citing Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008)). Thus, the Medical Defendants satisfy the state actor component of § 1983 even though they are not directly employed by the government.

B.    **The *Brawner* Standard for Deliberate Indifference & the *Farmer* Standard for a Qualified Immunity Defense**

The court also considers the standard governing Plaintiff's deliberate indifference claim against the defendants.  As a pretrial detainee, Askew had a Fourteenth Amendment Due Process right to be free from deliberate indifference as to his serious medical needs. *Greene v. Crawford County*, 22 F.4th 593, 605 (6th Cir. 2022).  Prior to September 2021, the Sixth Circuit assessed pretrial detainees' Fourteenth Amendment deliberate indifference claims under the same standard as inmates' Eighth Amendment deliberate indifference claims. *Id*. Under that test, derived from *Farmer v. Brennan*, 511 U.S. 825 (1994), a successful plaintiff must satisfy both (1) an objective prong and (2) a subjective prong.  *Howell*, 67 F.4th at 311. "To satisfy the objective component, a plaintiff must show that the individual had an 'objectively' serious medical need."  *Id.* (quoting *Farmer*, 511 U.S. at 834). To satisfy the subjective component, a plaintiff must show that an official knew of and disregarded an excessive risk to inmate health or safety, and the official must have been aware of facts from which the inference could be drawn that a substantial risk of harm existed, *and* he must also have drawn the inference. *Id.* "This is a high standard of culpability, 'equivalent to criminal recklessness.'" *Greene*, 22 F.4th at 606

12

(quoting *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018)).

In September 2021, the Sixth Circuit's decision in *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021), modified the *Farmer* test for purposes of pretrial detainees' Fourteenth Amendment deliberate indifference claims. *Greene*, 22 F.4th at 606. *Brawner* left *Farmer*'s objective prong intact; it only modified the subjective prong. *Id*. Instead of requiring that a plaintiff show that the defendant knew the relevant facts, drew the inference from those facts that a substantial risk of harm existed, and then disregarded that risk, under *Brawner*, the plaintiff need only show "more than negligence but less than subjective intent—something akin to reckless disregard" for a plaintiff's serious medical needs. *Brawner*, 14 F.4th at 597 (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)). "Mere negligence is insufficient. A defendant must have not only acted deliberately (not accidentally), but also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id.* (citations omitted). The *Brawner* test is "more lenient" than *Farmer*'s more demanding test. *See Lawler as next friend of Lawler v. Hardeman County*, 93 F.4th 919, 928 (6th Cir. 2024). *Brawner* sets forth "a lower standard that doesn't require actual knowledge of a serious risk of harm" on the part of the defendant official. *Whyde v. Sigsworth*, No. 22-3581, 2024 WL 4719649, at *2 (6th Cir. Nov. 8, 2024).

Although the relevant events at Trumbull County jail occurred in November 2020 and thus predated *Brawner*'s disposition in September 2021, *Brawner* provides the governing standard. *See, e.g.*, *Mercer v. Athens County*, 72 F.4th 152, 161–62 (6th Cir. 2023) (applying *Brawner* standard to a deliberate indifference claim against a jailhouse nurse stemming from an incident that occurred in 2018). But if a defendant asserts the affirmative defense of qualified immunity, then *Farmer* applies when the relevant conduct predated *Brawner* as the analysis

13

centers around whether the official "violated law that was clearly established *at the time of the alleged misconduct.*" *Whyde*, 2024 WL 4719649, at \*\*2-3 (emphasis in the original) (noting that "the qualified immunity analysis turns on precedent that applied at the time of the alleged misconduct"); *Little v. City of Morristown, Tennessee*, No. 23-5302, 2024 WL 1530468, at \*3 (6th Cir. Apr. 9, 2024) (noting that only older decisions applying *Farmer* provide clearly established law for deliberate indifference claims when "the date of the conduct at issue predates *Brawner*"); *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.").

However, this qualified immunity issue regarding the *Brawner* versus *Farmer* precedent is not relevant to the Medical Defendants. Because under binding circuit precedent, private medical providers working for the government—including in prison settings—are not eligible to assert the affirmative defense of qualified immunity. *McCullum v. Tepe*, 693 F.3d 696, 704 (6th Cir. 2012); *Howell*, 67 F.4th at 317 n.4. Therefore, for all the Medical Defendants, the deliberate indifference inquiry proceeds under the *Brawner* standard.[6]

The qualified immunity analysis is relevant for corrections officer Machingo, who is both eligible to raise a qualified immunity defense and has raised that defense. Therefore, the court assesses Machingo's qualified immunity defense through the lens of *Farmer,* as it was the governing law at the time of the relevant events in the Trumbull County jail.

---

[6] Even in the absence of precedent like *McCullum* and *Howell*, *Brawner* would still govern the Medical Defendants' motion as they have not raised the affirmative defense of qualified immunity. *See Hall v. Carl*, No. 22-5702, 2023 WL 2553861, at \*3 (6th Cir. Mar. 17, 2023) (collecting cases and noting that qualified immunity is an affirmative defense that is forfeited if not raised).

### C.    Deliberate Indifference

#### 1.  Objective Component

As noted above, the objective prong is the same under both *Brawner* (for the Medical Defendants) and *Farmer* (for Officer Machingo's qualified immunity defense). The question is whether Askew "had an 'objectively' serious medical need." *Howell*, 67 F.4th at 311.  The Sixth Circuit Court of Appeals has "routinely held that a condition resulting in death is 'sufficiently serious' to meet the objective component." *Id.* at 311–12 (quoting *Burwell v. City of Lansing*, 7 F.4th 456, 463 (6th Cir. 2021)); *see also Winkler*, 893 F.3d at 890–91; *Rouster v. County of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014). Askew's medical need was also an objectively serious one given that it was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Howell*, 67 F.4th at 311 (citations omitted). The corrections officers could tell that Askew required medical attention even though they did not have the same medical training as Malvasi LLC's medical personnel. *Shadrick v. Hopkins County*, 805 F.3d 737 (6th Cir. 2015) ("The deputy jailers could tell that Butler needed prompt medical treatment even though they did not have the same medical training as SHP's nurses.")

In the defendant-by-defendant analysis that follows, the Court proceeds from the premise that a reasonable jury could find that Askew had an objectively serious medical need, such that Plaintiff satisfies the objective component of both the *Brawner* and *Farmer* tests.

#### 2. Subjective Component

The Court now assesses each defendant's motion for summary judgment, beginning with the Medical Defendants.  In doing so, the court keeps in mind that under *Brawner*'s deliberate indifference standard, "a defendant need not diagnose the cause of the medical distress in order for such need to indicate medical issues beyond the defendant's capability that require

emergency care."  *Grote v. Kenton County*, 85 F.4th 397, 409 (6th Cir. 2023).  For the most part, many of the medical assistants here "could provide only the most basic medical care despite the obvious signs that [Askew] needed more"—which enables Plaintiff's deliberate indifference claim to survive against almost all of them.  *Id.*

### Tayler Simmons

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could return a verdict in Plaintiff's favor with respect to its § 1983 deliberate indifference claim against Tayler Simmons.  That is, a reasonable jury could find that Askew had an objectively serious medical need and that Simmons acted deliberately and recklessly in the face of that risk.  *See Brawner*, 14 F.4th at 596–97.

Consider, for example, Simmons did not re-check Askew on the afternoon of November 11, after corrections officer Lynn called for medical assistance, because she had seen him earlier. (R. 84, PageID# 3308; R. 94, PageID# 5387, 5390–91, 5399). Simmons's decision to not check on Askew was certainly deliberate, not accidental. A reasonable jury could find that this decision was reckless given Askew's continued complaints of severe pain and the abnormal, growing protrusion on his stomach that Simmons had personally observed. Further, that Simmons "fail[ed] to check" on Askew coupled with the fact that it was arguably "apparent to a layperson" that Askew needed further medical attention (as evidenced by Askew's fellow inmates' actions and the behavior of the correctional officers) warrant denying Simmons's motion for summary judgment. *See Howell*, 67 F.4th at 312–13; *see also Grote*, 85 F.4th at 409 (finding that "[t]he need for medical attention based on [inmate's] severe symptoms was obvious even to non-medical professionals, and [jail nurse's] failure properly to appreciate that risk does not mean that she did not act recklessly" under *Brawner*). Simmons' own testimony indicates that Askew's

16

condition concerned her enough that she called Dr. Malvasi a number of times (R. 94, PageID#
5337-40), allowing a reasonable jury to find a failure to follow-up was reckless.

### Bree Bright

The same holds for Bree Bright. Viewing the evidence in the light most favorable to
Plaintiff, a reasonable jury could return a verdict in Plaintiff's favor with respect to Plaintiff's
§ 1983 deliberate indifference claim against Bright. A reasonable jury could find that Askew had
an objectively serious medical need and that Bright acted deliberately and recklessly in the face
of that risk. *See Brawner*, 14 F.4th at 596–97. Much like Simmons, Bright "fail[ed] to check" on
Askew when a correctional officer advised that Askew was in need of medical attention. *Howell*,
67 F.4th at 312–13. After Askew had activated the intercom at 11:37 p.m. on November 11,
seeking medical attention, Officer Cullins had relayed that information to Bright.  (R. 78,
PageID# 1657-58, 1681, Exh. 12). Despite this notification, Bright did not check on Askew,
indicating only that Askew would see the doctor in the morning. *Id.* Again, this evidence is
sufficient to allow a reasonable jury to find the failure to check on Askew was reckless under the
circumstances.

### Jess Johnson

A jury could also find Jess Johnson to have been deliberately indifferent under *Brawner*.
After Officer Lynn asked Johnson to give Askew medical attention on the afternoon of
November 11, Johnson simply informed Askew that he was on the list to see Dr. Malvasi. (R. 76,
PageID# 1389, 1393). Further, Johnson does not recall contacting LPN Ahart or Dr. Malvasi. *Id.*
at PageID# 1395. A reasonable jury could find that Johnson's failure to seek additional medical
attention on Askew's behalf amounted to deliberate indifference. *See, e.g., Greene*, 22 F.4th at
613 (concluding that a jury could find that failing to seek "any medical help" and not "rendering

any medical aid" could amount to reckless disregard to a serious medical need); *Mercer*, 72 F.4th at 162 (observing that failure to "seek additional medical assistance," such as care from a doctor or hospital, could result in a finding that the nurse acted recklessly and denying summary judgment).

### Jennifer Bach

Jennifer Bach has moved for summary judgment on all counts. Her motion presents a thornier legal question than those of the other medical assistants, because she only interacted with Askew in the early stages of his stay at the jail, and therefore, was only present at the earliest stages of Askew's progressively worsening condition. That is relevant because the court is mindful that it cannot "impute knowledge from one defendant to another." *Greene*, 22 F.4th at 607 (citation omitted).

Bach argues that she was not deliberately indifferent given that she simply followed Dr. Malvasi's instructions in the aftermath of the urinalysis, and was not qualified to determine an appropriate treatment plan for Askew. (R. 95, PageID# 5531, 5544–46; R. 113, PageID# 6855). For these same reasons, Bach contends that she was not even negligent, such that the state law claims against her also must fail. (R. 95, Pg. 5544–46).[7] In addition, after the urinalysis episode, Askew registered no further complaints during the remainder of Bach's shift. *Id.* at PageID# 5531.

Plaintiff counters that after Dr. Malvasi advised that Askew should keep pushing fluids, Bach did not personally convey that information to Askew. (R. 106, PageID# 6046). Moreover,

---

[7] In her brief in support of summary judgment, Bach argues "[t]here isn't anything that indicates Bach was negligent. Bach performed work that was within the scope of her licensure, shared the information with Dr. Malvasi, who then provided her with instructions on how to proceed." (R. 95, PageID# 5547).

Bach does not actually recall passing along any information regarding Askew to the medical assistant, Bright, who relieved her at the close of her shift. (R. 68, PageID# 577, 608–09). Bach also testified that she believes she took no further steps with respect to Askew's complaint other than passing along Dr. Malvasi's answer via the electronic kiosk. *Id.* at PageID# 576. Finally, Bach did not record that Askew had any sort of medical issue in the shift report. *Id.* at PageID# 601–02.

To be sure, under *Farmer*, a defendant following the instructions of a medical higher-up will often preclude the plaintiff from establishing that the subjective prong could be met. *See, e.g.*, *Est. of Majors v. Gerlach*, 821 Fed. App'x 533, 547 (6th Cir. 2020) (concluding as much while conducting a qualified immunity analysis). But under *Brawner*, that high subjective bar is no more, and Plaintiff must show only that a reasonable jury could find that Bach acted deliberately and recklessly in the face of Askew's serious medical need. After all, in response to the question whether she would, in general, "put someone on general observation status if you were concerned that they had a condition that might deteriorate and require attention," Bach answered in the affirmative. (R. 68, PageID# 603). She also affirmed that she would normally "put [an inmate] on medical observation if they were showing symptoms of something [she] thought might represent a serious medical issue." *Id.* Yet Bach did not do so for Askew—though Bach testified she was aware he was urinating blood. (R. 68, PageID# 610). Indeed, Bach personally documented that Askew had a "large" amount of "blood" in his urine based on the urinalysis results. (R. 68, PageID# 584).[8]

Ultimately, the Court finds it decisive that Bach did "seek medical attention" on Askew's

---

[8] That said, Bach testified she did not know whether the result was in normal limits. (R. 68, PageID# 584).

behalf by forwarding the urinalysis results to Dr. Malvasi, as the Sixth Circuit has found *failures* to seek medical attention to be deliberate indifference under *Brawner*. *See, e.g.*, *Mercer*, 72 F.4th at 162.[9] Sixth Circuit precedent in *Winkler* is also instructive here. Therein, an on-site nurse's actions mirrored Bach's actions here: the nurse "gathered information about [the inmate's] condition, provided it to a medical professional qualified to evaluate him, and followed the directions of that medical professional." *Winkler*, 893 F.3d at 894. Those actions did not amount to deliberate indifference under *Farmer*. *Id.* Although that conclusion does not control here under the *Brawner* standard, it still significantly cuts against finding that Plaintiff could satisfy the subjective component of deliberate indifference *vis-a-vis* Bach.

In short, the Court grants summary judgment in Bach's favor on Plaintiff's § 1983 deliberate indifference claim against her.

By contrast, a reasonable jury could find Bach to have acted negligently or to have failed to live up to the governing standards of care in Ohio (for purposes of Plaintiff's medical malpractice claim) for the reasons emphasized by Plaintiff above. After all, the Sixth Circuit has found that a medical professional giving inadequate instructions to jail personnel regarding a sickly inmate can help a plaintiff clear deliberate indifference's high bar. *Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 486 (6th Cir. 2014). That indicates that Bach's ostensible failure to share *any* information with *any* colleagues regarding Askew could allow Plaintiff to clear the lower bar set by medical malpractice. *Cf. Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (assuming that medical malpractice is a lower hurdle for a plaintiff to clear when alleging

---

[9] Any documentation failures on Bach's part that flouted internal policies do not alone support the estate's deliberate indifference claim. *Mercer*, 72 F.4th at 161; *Winkler*, 893 F.3d at 891–92. To be sure, they can provide "persuasive evidence of deliberate indifference." *North v. Cuyahoga County*, 754 F. App'x 380, 386 (6th Cir. 2018).

20

inadequate medical treatment as compared to a constitutional violation); *Winkler*, 893 F.3d at 893, 905 (noting that conduct that does not amount to deliberate indifference may still give rise to meritorious state law claims).

### Carla Ahart

Based on the record, precisely what LPN Carla Ahart did over the course of Askew's time in the Trumbull County jail is less than clear. Ahart was on-call 24/7 to answer the questions of medical assistants (R. 101, PageID# 5748, 5780), and she testified that she never received a call from the jail regarding Askew from November 6 through November 12—or at least did not remember receiving any such communication. (R. 101, PageID# 5810, 5811). By contrast, Simmons testified that she contacted Ahart regarding Askew's complaint of severe pain and the protrusion on his stomach, and even spoke to Ahart regarding Askew. (R. 94, PageID# 5398).

Therefore, the nature and extent of Ahart's involvement and what she was aware of appears to hinge in large part on credibility determinations, a job reserved for the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Depending on its assessment of the evidence before it, a reasonable jury could conclude that Ahart was aware of Askew's situation but "did nothing." *Rhinehart v. Scutt*, 894 F.3d 721, 757 (6th Cir. 2018) (Moore, J., concurring in part and dissenting in part). A jury could find that Ahart failed to answer text messages and calls despite awareness of the same, yet effectively provided "no treatment" to Askew. If a jury credits

Simmons' testimony over Ahart's, it could find that even though Askew's need for further medical attention was apparent, that she was a critical point of contact for the on-the-ground medical assistants, and that she took no action. *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 846 (6th Cir. 2002) (finding that a nurse's delayed response cost the decedent time during which he may have received life-saving medical care and could constitute deliberate indifference). Such findings could provide grounds for a finding of deliberate indifference.[10]

As such, a reasonable jury could also find that Plaintiff clears the even lower hurdle set by state-law medical malpractice. *Cf. Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (working off the assumption that a plaintiff alleging inadequate medical treatment can more easily show medical malpractice as compared to a constitutional violation). The court accordingly denies summary judgment to Ahart with respect to all Plaintiff's claims against her.

### Phillip Malvasi, D.O.

Just as with Ahart, exactly what Dr. Malvasi did or did not do with regards to Askew's care during his detention at the Trumbull County jail is not altogether clear. If the testimony of the medical assistants is to be believed, Dr. Malvasi was repeatedly contacted about Askew's situation and was unresponsive for long periods of time—much like Ahart. (R. 94, PageID# 5339-40, 5393–94). In light of the same reasons and Sixth Circuit precedents cited above with respect to Ahart, a reasonable jury could also find that Dr. Malvasi was deliberately indifferent to Askew's serious medical needs.[11] Granted, Dr. Malvasi did advise that Askew "push fluids" in

---

[10] As Plaintiff convincingly argues in its brief: "A jury could reasonably find that [Ahart] knowingly practiced outside her scope, was aware of Askew's suffering due to contact from MAs, and took no action to aid the MAs in providing proper care for Askew or to involve Dr. Malvasi in his care." (R. 106, PageID# 6072).

[11] The Court agrees, as Plaintiff's argue, that "if a jury believes all of the MA's accounts, [Dr. Malvasi] was notified several times over multiple days about the whole range of Askew's

light of his urinalysis results, but a reasonable jury could find that sole directive, coupled with the failure to intervene in the face of alleged calls and messages from medical assistants, "amounted to treatment 'so cursory as to amount to a conscious disregard' of [Askew's] clear medical needs." *Grote*, 85 F.4th at 409 (quoting *Rouster v. County of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014)).

It is similarly unclear why Dr. Malvasi did not see Askew on the morning of November 11. Depending on one's assessment of different actors' credibility, a jury may disbelieve that Askew affirmatively refused to see Dr. Malvasi that morning. Making that determination is the role of the jury, not this court. *Anderson*, 477 U.S. at 255. A jury's determination on that issue may weigh heavily on its assessment of whether Dr. Malvasi was deliberately indifferent to Askew's serious medical needs.[12] Therefore, the court denies Dr. Malvasi's motion for summary judgment.

### Dr. Phillip Malvasi D.O., LLC ("Malvasi LLC")

As stated above, to prevail on a § 1983 claim, Plaintiff must prove both (1) that it was deprived of a constitutional right and (2) that this deprivation was "caused by a person acting under color of state law." *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir.2010) (citation omitted).  In the context of Plaintiff's claim against Malvasi LLC, the fact that Malvasi LLC is a private entity does not prevent Plaintiff from establishing the second requirement (*i.e.*, that the defendant is acting under color of state law). "A private entity, such as [Malvasi LLC], that

---

symptoms and did nothing to ensure he received evaluation and care."  (R. 106, PageID# 6072).
[12] Again, Plaintiff correctly points out that "[a] jury could also readily find that he fabricated the alleged refusal of care on November 11, and that Malvasi instead simply failed to see Askew when he could still have been saved on that day." (R. 106, PageID# 6072). Conversely, a jury could find that the evidence supports the doctor's explanation. Such questions of material fact are for a jury to consider.

contracts to provide medical services at a jail can be held liable under § 1983 because it is carrying out a traditional state function." *Winkler*, 893 F.3d at 904.

As for establishing the first requirement—the constitutional right deprivation—Plaintiff looks to a failure-to-train theory, among others. Plaintiff alleges that Malvasi LLC was "deliberately indifferent to the serious medical needs of Mr. Askew by failing to train and supervise" the jail's medical staff. (R. 1, PageID# 16). Notably, there is Sixth Circuit precedent relevant to a failure-to-train theory, under § 1983, against a private healthcare entity providing medical services on behalf of a county jail. *See, e.g., Shadrick*, 805 F.3d 724.

This failure-to-train theory requires Plaintiff to show either (1) past examples of constitutionally inadequate treatment on the part of Malvasi LLC or (2) how Malvasi LLC's training program's deficiencies "were so obvious" as to put Malvasi LLC "on notice that a constitutional violation was likely." *Winkler*, 893 F.3d at 904. Plaintiff makes no mention of past examples, so it makes no argument under the first theory. However, it does make an argument under the second theory. Drawing on *Shadrick*, Plaintiff argues that Malvasi LLC's training program was so obviously deficient that it left Malvasi LLC on notice that a constitutional violation was likely. Plaintiff points out that medical assistants have a limited scope of practice and require supervision, (R. 106, PageID# 6061-62, citing R. 68, PageID# 515; R. 76, PageID# 1336; R. 94, PageID# 5224); that they cannot assess the health status of a patient for the purpose of providing medical care or act beyond their scope of practice (*Id*., citing R. 68 at PageID# 515; R. 70, PageID# 761; R. 76, PageID# 1265); and that they cannot diagnose or make decisions about patient evaluations and care. (*Id*., citing R. 70, PageID# 762; R. 76, PageID# 1336-1337).

A reasonable jury could conclude that Malvasi LLC's failed to train and supervise its medical personnel "about the legal duty to provide constitutionally adequate medical care

amounted 'to deliberate indifference to the rights of persons with whom the [medical staff] come into contact.'" *Shadrick*, 805 F.3d at 737. Consider *Shadrick* and its similarity to the facts of this case.  There, the court pointed out that by assuming a county's "constitutional medical obligations to its prisoners," a private health-care provider (like Malvasi LLC) "knew" that its medical staff "interacted with dozens of inmates presenting a wide and recurring range of medical conditions that required timely and accurate diagnosis and treatment."  *Id.* at 739.  Given the provider's inadequate training program for its staff, a reasonable jury could find that the provider was deliberately indifferent.  *Id.* at 739–40.[13]

The *Shadrick* court concluded that the training program at issue in that case was inadequate under *Farmer* (which, recall, is more forgiving towards defendants than *Brawner*) for reasons that apply in full force to the facts of this case. For example, the Court began by emphasizing that there was "no indication in the record" that the provider "implemented any type of ongoing training" for its medical staff at the jail. *Id.* at 140. Here, Dr. Malvasi testified that the only formal training that medical staff receive is a two-week on-the-job training program when they first start that is geared towards orienting them to providing medical care in a correctional setting. (R. 88, PageID# 3787–88). Other than those two weeks at the start of employment, there is no other training. *Id.* at PageID# 3788.

Further, the *Shadrick* court stressed that the LPN nurses at issue there "lack[ed] any authority to diagnose medical conditions, yet the nurses [were] routinely confronted with

---

[13] The court acknowledges that it is rare for a failure-to-train theory to be able to rest on the notion that the risk of a rights deprivation was so obvious that the defendant's not adequately training its employees to combat that risk amounted to deliberate indifference. *See, e.g.*, *Howell*, 67 F.4th at 319 (noting that this class of cases represents a "narrow range"). But *Shadrick* makes clear that providing medical care in a prison setting squarely falls within that narrow range.  *See* 805 F.3d at 739–40.

frequent and competing demands for medical care arising from the needs of numerous inmates suffering from maladies of varying severity." *Shadrick*, 805 F.3d at 740 ("It is predictable that placing an LPN nurse lacking the specific tools to handle the situations she will inevitably confront in the jail setting will lead to violation of the constitutional rights of inmates. A reasonable jury, therefore, could determine that SHP's failure to train and supervise its LPN nurses in meeting their constitutional obligations demonstrates SHP's own deliberate indifference to the highly predictable consequence that an LPN nurse will commit a constitutional violation.") The same hold true with Malvasi, LLC's medical assistants here, who have even *less* training than LPNs. Indeed, the medical assistants here were *supervised* in part by an LPN, Ahart, who was never at the jail during the relevant time frame and allegedly never called back Simmons, if her testimony is credited.

In addition, just like in *Shadrick*, reasonable jurors could determine that the inadequate training resulted from deliberate indifference and that it caused or was closely related to Askew's death. *See Shardrick*, 805 F.3d at 742–44.  Because this case resembles *Shadrick*, summary judgment is inappropriate.

Meanwhile, this case is distinguishable from *Winkler*, in which the Sixth Circuit affirmed the district court's grant of summary judgment to the defendant in the face of a failure-to-train deliberate indifference claim brought against a private healthcare entity that provided medical services to inmates. In *Winkler*, the healthcare provider conducted "ongoing" trainings for its medical staff on protecting the rights of inmates to adequate medical care.  *Winkler*, 893 F.3d at 905. The evidence does not demonstrate the same here. This case is similarly distinguishable from *North v. Cuyahoga County*, wherein the jail relied not only on LPNs but also on more advanced medical professionals (like Registered Nurses) to provide care, and there were ongoing

staff meetings to discuss policy updates. 754 F. App'x 380, 393–94 (6th Cir. 2018).[14]

### Doug Machingo

Officer Machingo has moved for summary judgment on all claims brought against him. The court grants summary judgment in his favor on all claims, as explained herein.

**A.    Deliberate Indifference**

In assessing Machingo's motion for summary judgment, the court is mindful that Machingo is a correctional officer, not a medical professional. Accordingly, he "had different training and responsibilities" than the Medical Defendants in this case. *Mercer*, 72 F.4th at 162. That is an "important" consideration "in determining" whether Machingo violated Askew's constitutional rights. *Id.*; *see also Berry v. Delaware Cnty. Sheriff's Off.*, 796 F. App'x 857, 862 (6th Cir. 2019) ("The training that officers receive (when they are not the primary medical care providers) and the training that licensed practical nurses receive (when they are the primary medical care providers), along with the tasks they must perform, are meaningfully different.")).

A reasonable jury could *not* find, even viewing the evidence in the light most favorable to Plaintiff, that Machingo was deliberately indifferent to Askew's serious medical need. That is, there is no genuine dispute of material fact, and Machingo is entitled to judgment as a matter of law.

Each time that Machingo received a complaint from Askew about his medical condition, Machingo notified his superiors so that they could alert the medical staff. (R. 86, PageID# 3506;

---

[14] Because Plaintiff's failure to train theory enables it to survive Malvasi LLC's summary judgment motion with respect to its deliberate indifference claim, the Court need not address the Estate's other two theories—that Malvasi LLC's policies and customs violated Askew's constitutional rights and that its tolerance and ratification of unconstitutional conduct caused Askew's injuries. (R. 107, Pg. ID 6097–6102).

R. 78, PageID# 1681; R. 82, PageID# 3212–13). Machingo notified his superiors of Askew's condition, which coupled with his and other officers' reliance on the medical staff's determinations, does not amount to deliberate indifference. Sixth Circuit precedent makes clear that jail officials are entitled to reasonably rely on the medical judgments of medical staff. *Winkler*, 893 F.3d at 895 (citing *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009) (concluding that nonmedical jail personnel are entitled to reasonably rely on the assessments made by the medical staff).

That same well-established principle helps explain why Machingo's failure to report to medical staff that Askew again had coloration in his vomit during the breakfast tray drop-off on the morning of November 12, 2020, does not foreclose summary judgment in Machingo's favor. A few hours before the tray drop-off, Machingo had been in Askew's cell with Medical Assistant Bright when she was put on notice of Askew's issues—including the coloration of his vomit. The essence of Bright's response was that Askew would see the doctor quite soon. (R. 68, PageID# 720; R. 78, PageID# 1681). When Machingo observed that Askew's condition remained unchanged while dropping off his breakfast tray (*i.e.*, that Askew still had color in his vomit), Machingo was entitled to rely on Bright's medical judgment that Askew seeing the doctor quite soon was the appropriate response. "Where, as here, an officer responds to a substantial risk of serious harm by asking for and following the advice of a professional [that] the officer believes to be capable of assessing and addressing that risk, then the officer commits no act of deliberate indifference in adhering to that advice." *McGaw v. Sevier County*, 715 F. App'x 495, 498–99 (6th Cir. 2017); *see also Mercer*, 72 F.4th at 162–63; *Greene*, 22 F.4th at 608; *Howell*, 67 F.4th at 315.

To be sure, a correctional officer's deference to medical professionals, under certain

28

circumstances may be unreasonable, and expose that officer to liability under a deliberate indifference theory, "when the officer is aware of additional information concerning an incarcerated person's condition, or if the medical professional rendered their opinion prior to changed circumstances." *Grote*, 85 F.4th at 412. None of those conditions apply here. That Askew's vomit had color in it that might be blood was not a new development or a change circumstance from what was already perceived by medical personnel. Bright had observed precisely these same circumstances alongside Machingo not long before.

In sum, Machingo is entitled to summary judgment even without considering qualified immunity—though it follows that his conduct did not run afoul of any law—namely, precedent interpreting the more forgiving *Farmer* standard—that was clearly established as of November 2020. *See, e.g.*, *Shaver v. Brimfield Twp.*, 628 F. App'x 378, 383 (6th Cir. 2015) (finding no deliberate indifference under *Farmer* when a jail officer reasonably contacted and relied upon medical staff).

**B.     State Law Claims**

Machingo is also entitled to summary judgment on Plaintiff's state-law claims—namely, counts four through six for negligence, wrongful death, and survivorship. Machingo has state-law immunity as an employee of a political subdivision. O.R.C. § 2744.03(A)(6). Section 2744.03(A)(6) provides three exceptions to this normal rule: (a) "[t]he employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities"; (b) "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner"; or (c) "[c]ivil liability is expressly imposed upon the employee by a section of the Revised Code." *Id.* § 2744.03(A)(6)(a)–(c). Neither (a) nor (c) is relevant here.

The question here is whether Machingo acted "with malicious purpose, in bad faith, or in a wanton or reckless manner" under section (b). The Court's review of the evidence indicates he did not. "When federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same questions of material fact," the court "may review the state-law immunity defense 'through the lens of the federal qualified immunity analysis.'" *Hopper v. Phil Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009)). Therefore, Machingo's "statutory immunity defense stands or falls with [his] federal qualified immunity defense." *Id.* at 760. Because Machingo's qualified immunity defense succeeds, so does his statutory immunity defense. *See Ruiz-Bueno v. Scott*, 639 F. App'x 354, 365 (6th Cir. 2016) ("For the same reasons that Deputies Nibert and Hoar cannot be found to have acted with deliberate indifference, we hold that there is insufficient evidence to find that they acted with malicious purpose, in bad faith, or in a wanton or reckless manner.").

Thus, Machingo is entitled to summary judgment on all claims against him, including the state law claims.

### **Trumbull County**

Just like Machingo, Trumbull County has moved for summary judgment with respect to all of Plaintiff's claims against it. The court addresses each set of claims, under § 1983 and state law, in turn.

**A.     Deliberate Indifference**

Plaintiff has advanced a number of theories contending that Trumbull County should be held liable under § 1983, but none are convincing.

First, Plaintiff asserts a theory of *Monell* liability against the County—that Machingo violated Askew's constitutional rights, and the County's policies, practices, or customs were a

30

moving force behind such violation. (R. 107, PageID# 6095.) This particular theory of *Monell* liability falls short because Machingo did not violate Askew's constitutional rights. *Winkler*, 893 F.3d at 901; *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam).

Similarly, Plaintiff's argument—that the County failed to adequately train correctional staff cannot be the basis for its claim surviving the County's summary judgment motion given that there is no "affirmative link" between that allegedly inadequate training and a rights deprivation. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged."). As the foregoing analysis makes clear, it was the alleged actions, or inaction, of the Medical Defendants, not the correctional officers, that may have contributed to Askew's death.

All that being said, "it is proper to consider possible constitutional violations committed by a municipality *qua* municipality, even in the absence of a showing of a constitutional violation by any one individual officer." *Grote*, 85 F.4th at 414. Hence Plaintiff's next attempt to hold Trumbull County liable under § 1983: that the County's policy of allowing Malvasi LLC to manage all medical care at the jail was a moving force behind a violation of Askew's constitutional rights. (R. 107, PageID# ID 6102-05.)

Under this theory, Plaintiff must show that a county policy inflicted a constitutional injury on Askew. In *Graham ex rel. Est. of Graham v. County of Washtenaw*, the Sixth Circuit Court of Appeals was confronted with a similar theory of liability for a county's operation of its jail:

> Graham's claim is based upon the County's contract with SecureCare, which gives SecureCare responsibility over the provision of medical care to prisoners in the County jail. The County concedes that this contract constitutes a municipal "policy" within the meaning of *Monell*.

> The primary issue is whether Graham has alleged sufficient facts to establish that the alleged constitutional violation happened "*because of* the execution of [the County's] policy." *Id*. (emphasis added). There must be "a direct causal link" between the policy and the alleged constitutional violation such that the County's "deliberate conduct" can be deemed the "moving force" behind the violation. *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir.2001) (citing *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)) (quotation marks omitted); *see also Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir.1994). These stringent standards are "necessary to avoid *de facto respondeat superior* liability explicitly prohibited by *Monell*." *Doe*, 103 F.3d at 508. Applying these standards, we conclude that Graham has failed to establish the requisite causal link between the County's policy and the alleged constitutional violation.

*Graham*, 358 F.3d at 383 (emphasis in original).

As Trumbull County's contract with a private healthcare entity to provide medical services at a county jail constitutes a "policy," the remaining question is whether Askew incurred a constitutional injury stemming from the execution of that contract. *Id.* Plaintiff, however, is unable to make this showing under Sixth Circuit precedent. In *Graham*, the plaintiff had died in police custody. 358 F.3d at 379. Much like Plaintiff herein, Graham's estate brought a § 1983 claim against the county and argued that the county's contract with a private entity to provide medical care to detainees led to the deprivation of his constitutional right to adequate medical care. *Id.* at 382. In particular, Graham took issue with the contract's provisions for jail officials owing deference to the medical employees and with the fact that the contract enabled some of the medical employees to practice "beyond their competence" under state law. *Id.* at 383.

The Sixth Circuit affirmed the district court's grant of summary judgment to the county. The *Graham* court noted that "most would find" the county's policy of contracting out detainee medical services to a private provider (and allowing for deference to the provider employees' medical decision-making process) "laudable in many respects." *Id.* at 384. "Not only does such a policy—like the one at issue in this case—allow prisoners to receive prompt health care from on-

site doctors or nurses, it also ensures that an independent party, rather than a corrections officer, makes the critical decisions about whether and at what point a prisoner's medical needs are sufficiently severe that ambulatory care or hospitalization is warranted." *Id.*; *see also Winkler*, 893 F.3d at 901 ("a municipality may constitutionally contract with a private medical company to provide healthcare services to inmates"). The *Graham* court then reasoned that the contract's delegation of medical care to the private provider, coupled with the fact that the provider allowed certain employees to potentially engage in actions beyond their scope of expertise, were insufficient "to hold the County liable for the alleged constitutional violation in this case." *Graham*, 358 F.3d at 384 ("Even if, as Graham contends, the policy required jail personnel to defer to the medical decisions of SecureCare employees, and even if it permitted licensed practical nurses to make medical decisions that Michigan law does not permit them to make, those alleged defects are insufficient to hold the County liable for the alleged constitutional violation in this case."). The court buttressed its conclusion by noting that Plaintiff's allegations "focus[ed] primarily upon the inadequacy of the medical treatment that was provided to Mr. Graham by [the medical provider] and its staff." *Id.* at 385.

All those considerations hold true in this case, such that granting summary judgment to the County here is appropriate as it was in *Graham*. And just like in *Graham*, as explained above, it is "possible that the medical care that [Askew] received was so woefully inadequate as to rise to the level of a constitutional violation." *Id.* at 384. Even so, the deprivation did not directly result from the County's contracting with Malvasi LLC. *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 390–91 (1989)).[15]

---

[15] Plaintiff's reliance on *Winkler* does not change the result. Therein, a similar county-private medical provider setup was also at issue. The court emphasized that the private provider's

The more difficult question is whether the County may be held liable under § 1983 as a matter of course for Malvasi LLC's policies, customs, and/or failure to train. That is, does "the policy of the entity [become] the policy of the county by default"? *Deaton v. Montgomery County*, 989 F.2d 885, 888 (6th Cir. 1993).

The foregoing analysis in *Graham* and *Winkler* cuts against the notion that the County must be held liable for the private contractor's constitutional misdeeds. The Sixth Circuit's decision in *Johnson v. Hardin County*, 908 F.2d 1280 (6th Cir. 1990), also counsels against imputing liability to the County for the private healthcare contractor's actions or inactions as a matter of course. In *Johnson*, the plaintiff attempted to hold the county accountable for the county jailer's denial of adequate care to him on the grounds that the jailer "had the authority to establish treatment policy…." *Id.* at 1285. To prevail on this claim, the Sixth Circuit reasoned that the plaintiff had to "produce[] evidence from which a jury could reasonably conclude that [the jailer] was vested with final authority to set medical treatment policy for the county's prisoners." *Id.* at 1286. The plaintiff failed to do so: there was no evidence indicating that the jailer was "vested with authority to make all of the county's medical *policy* decisions." *Id.* at 1287 (emphasis in the original).

In the case at bar, the evidence of record indicates that Trumbull County vested Malvasi LLC with the authority to provide medical *services* to the jail's inmates, but it did not vest Malvasi LLC with the ultimate authority to set medical *policy* in the jail. Under the terms of its

---

policies did not present an obvious risk to inmates' constitutional rights. *Winkler*, 893 F.3d at 901–02. In addition, *Winkler* did not suggest that that the county would automatically have been liable if the medical provider's policies presented such a risk, as *Winkler* also stated that there was no evidence that the county "knew of and disregarded [that] risk." *Id.* at 902. Assuming *arguendo* that Malvasi LLC's policies presented such a risk, Plaintiff has not presented evidence that the County knew of the risk yet disregarded it.

34

contract with the County, Malvasi LLC "agree[d] to render services" like urinalysis, EKGs, suture removal, antibiotic shots, and the like. (R. 80, PageID# 2377, "Medical Services Agreement"). But in rendering those services, Malvasi LLC was "constrained by policies not of [its] making." *Johnson*, 908 F.2d at 1286 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality.") (plurality opinion)). For example, Malvasi LLC agreed to maintain "complete and accurate records" of patient care to assist the County in "maintain[ing] the Jail in compliance with the Ohio Jail Standards." (R. 80, Pg. ID 2377, ¶2). In addition, Malvasi LLC agreed to have a physician "available for examination of inmates on a twenty-four (24) hour basis." *Id.* at PageID# 2379. Further, Malvasi LLC agreed that "the medical facility shall be staffed seven (7) days a week on a twenty-four (24) hour basis." *Id.* at PageID# 2379, ¶6.[16]

In sum, although Malvasi LLC had discretion in treating inmates, the County did not delegate all authority to Malvasi LLC to *carte blanche* set all medical policy within the jail, and set forth a number of requirements Malvasi LLC was required to adhere to. If Malvasi LLC purportedly failed to abide by the staffing requirements, for example, the lack of such staffing does not become the policy of the County. Therefore, Malvasi LLC's alleged failings cannot automatically be attributed to the County. In other words, to quote *Johnson*, Plaintiff has "introduced no evidence that indicates [Malvasi LLC was] vested with authority to make all of

---

[16] R. 80, PageID# 2379 ("For services rendered hereunder, the Jail Physician shall maintain a policy of malpractice insurance in the minimum amount of $1,000,000/$3,000,000 and shall further indemnify and hold the Sheriff's Office and Trumbull County harmless from any and all claims arising out of the performance of professional duties under this Agreement if a final judgment shall be rendered against the Sheriff's Office or Trumbull County by reason of professional services performed by the Jail Physician.").

the county's medical *policy* decisions." *Johnson*, 908 F.2d at 1287 (emphasis in original).

Accordingly, "[Trumbull] County cannot be held liable for the decisions of the [Malvasi LLC]

Defendants because those decisions do not reflect the official policy of [Trumbull] County."

*Jimenez v. Hopkins County*, No. 4:11-cv-00033, 2014 WL 176578, at *16 (W.D. Ky. Jan. 13,

2014), *rev'd in part sub nom. Shadrick v. Hopkins County*, 805 F.3d 724 (6th Cir. 2015).

The Court is cognizant of concerns that a municipality may "attempt[] to discharge its

constitutional duties by hiring contractors to provide fundamental services to those in the

municipality's care and then placing its head in the sand to remain oblivious to violations."

*Payne v. Sevier County*, 681 F. App'x 443, 448 (6th Cir. 2017) (Donald, J., concurring).

However, if a municipality does in fact delegate *full* policymaking discretion to the private

contractor, then under *Johnson* the municipality could *not* escape liability. Even in instances

wherein the municipality cannot be held liable, legal recourse is not foreclosed as the private

contractor providing governmental services may itself be liable under § 1983. *See Winkler*, 893

F.3d at 890. Thus, plaintiffs such as the Estate herein are not left without a potential remedy.

**B.      State-Law Claims**

The Court also grants summary judgment to Trumbull County on Plaintiff's state-law

claims. Under Ohio law, Trumbull County is a political subdivision that "is not liable in damages

in a civil action for injury, death, or loss to person or property allegedly caused by any act or

omission of the political subdivision or an employee of the political subdivision in connection

with a governmental . . . function." O.R.C. § 2744.02(A)(1). Operating jails constitutes a

"governmental function." *Id.* § 2744.01(C)(2)(h). None of the exceptions to political subdivision

immunity are applicable. *See id.* § 2744.02(B)(1)–(5).[17] Therefore, Trumbull County is immune and is granted summary judgment with respect to Plaintiff's state-law claims in Counts Five and Six.

## V. Conclusion

Defendants Machingo's and Trumbull County's motion for summary judgment (R. 65) is GRANTED and they are dismissed.

The motion for summary judgment filed by the Medical Defendants (Dr. Phillip Malvasi D.O., LLC, Phillip Malvasi, D.O., Tayler Simmons, Bree Bright, Jess Johnson, Carla Ahart, Nurse and/or Medical Assistant Jennifer Bach) (R. 95) is GRANTED in part and DENIED in part. It is GRANTED only with respect to the section 1983 claim in Count One against Defendant Bach, and the remainder of the motion is DENIED.

IT IS SO ORDERED.

s/ *David A. Ruiz*
David A. Ruiz
United States District  Judge

Date: October 10, 2025

---

[17] Plaintiff's opposition brief argues that § 2744, Ohio's immunity statute, does not affect Plaintiff's § 1983 federal claim against Trumbull County. It does not squarely address whether it may maintain a *state-law* action against Trumbull County. (R. 107, PageID# 6105-06).